Argued and submitted April 16, affirmed July 15, 2009

Barbara H. HEIPLE,
*Plaintiff-Appellant,*

*v.*

Mary Jo HENDERSON,
Barbara Higinbotham,
Gene Shutz,
Sheryl Warren,
State of Oregon Employment Division,
an Oregon public body,
and Jeanne Krausse,
*Defendants-Respondents.*

Marion County Circuit Court
04C15392; A131454

215 P3d 891

Marc T. Andersen argued the cause for appellant. With him on the brief was Law Offices of Foster Glass.

Leigh A. Salmon, Assistant Attorney General, argued the cause for respondents. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Michael C. Livingston, Senior Assistant Attorney General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Plaintiff's employment with the Oregon Employment Department was terminated after she refused the department's request that she submit to an independent medical examination (IME). After her termination, she initiated this action, alleging that the department had violated Oregon disability discrimination statutes and intentionally inflicted emotional distress on her. She also brought claims under 42 USC section 1983 against various individuals within the department. At the core of plaintiff's case is her contention that the department's request for an IME was neither "job-related" nor "consistent with business necessity" as those terms are used in state and federal anti-discrimination statutes. *See* ORS 659A.136(1); 42 USC § 12112(d)(4)(A). The trial court granted summary judgment on each of her claims, and plaintiff appeals. We write only to address plaintiff's discrimination claim against the department, and affirm.

We state the relevant facts from the summary judgment record and all reasonable inferences that we may draw from them in the light most favorable to plaintiff, the non-moving party.[1] *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 332, 83 P3d 322 (2004). Plaintiff was hired by the Oregon Employment Department in 1975 to work at its field office in John Day. During the relevant time, the field office was staffed by two people, plaintiff and Krausse. In 2002, Krausse began complaining to Higinbotham, her regional manager, about plaintiff's behavior at work. Krausse eventually reduced her complaints to an e-mail, which she sent in August 2002 to Shutz, a human resources manager in Salem. In the e-mail, Krausse described what she "perceive[d] as a potential and real safety concern for myself,

---

[1] We note, at the outset, that plaintiff's opening brief references e-mails and other evidence that does not appear in the trial court file. Defendants moved to strike some of plaintiff's materials on summary judgment, and the motion to strike appears to have been before the trial court at the summary judgment hearing. However, the end of that hearing does not appear to have been recorded, and it is not possible on the record before us to tell whether the court made an oral ruling on the motion to strike. Nonetheless, even assuming that the evidence described in plaintiff's opening brief and excerpt of record was before the trial court and should have been included in the court file as part of the summary judgment record, we would reach the same decision in this case.

if or when, [plaintiff] returns to the workplace [from her vacation]." As a basis for her safety concerns, Krausse described the following incidents to "help [Shutz] understand the bizarre working conditions [Krausse was] experiencing":

"First of all, here are some witnessed acts told to me by other state employees. She was witness[ed] by my [Krausse's] sister, Debi Hueckman, just standing in the bathroom in a trance-like state just pulling out paper towels one after another to the point where it over flowed the trash can. This incident was just after a reprimand from the leadworker, Joyce Wallin. My sister said she felt ill at ease and left without using the facilities.

"She also has been witnessed by an employee of SDSD, standing with her back up against the bathroom stall in a dispondent [sic] state. This worker said it made her feel uncomfortable.

"I personally have seen her totally lose emotional control with Barb Higinbotham to the point where I was not sure what she might do to her. During this same incident she came [out] of the room yelling at me that her two week suspension was my fault and told me thanks a lot for getting her in trouble. Then later that day she left me a voice mail, again, reiterating that fact that I personally had caused her discipline action.

"She has accused me of stealing trash in the confidential trash recycle bin, taking it home and pasting it together. It is also my understanding that she personally scurried through the recycle bin looking for the missing trash. She's accused me of using my job to benefit my family; that I reveal confidential information to my family and workers of other agencies. She has said I give out confidential information to people on employers. These accusations are simply not true. I know in mediation she made the comment that she wouldn't have reported all these things to my supervisor if she had known before today that I had nothing to do with her two week suspension. As though she had simply made those accusations out of vengeance.

"Each day that I work with [plaintiff] is like walking on eggshells, I never know what to expect and what might set her off. She spends most of her day e-mailing, printing the e-mails, reading them, tearing them up and now she is keeping them in a giant manila envelope since she suspects

that I retrieve them from the trash. She takes this envelope with her when she leaves the room. I suppose afraid [*sic*] I will steal it. Cindy Batease (TEC Jobs Worker) has personally witnessed her take a disinfectant wipe and wipe the manila envelope as though cleaning it. Cindy asked me what she was doing, and that she is acting more bizarre each day."

After receiving that e-mail, as well as a copy of another e-mail that Krausse had earlier sent to Higinbotham, Shutz reviewed plaintiff's personnel file. That file included reprimands and personnel actions, some of which related, albeit indirectly, to the matters in Krausse's e-mails. In December 2000, plaintiff had been reprimanded for failing to return from lunch in time to open the office to the public. In January 2002, plaintiff had received a two-month pay reduction. The letter documenting that reduction stated that plaintiff had stayed at the office two and one-half hours past her assigned work time to work on her personal checkbook, had called the police to report a break-in at the office, and had not contacted management or supervisory staff regarding the police report. The letter also stated that the department had received a complaint from a client to the effect that plaintiff was rude to him and repeated his confidential information loudly enough for other clients to hear. Finally, plaintiff's personnel file included documentation of a two-week suspension, effective June 1, 2002. The letter documenting the suspension indicated that it was based on six different incidents between March and April 2002, including (1) an incident in which plaintiff was overheard complaining to customers that the department was cutting back her hours and was mistreating her, despite the fact that plaintiff herself had requested a part-time position that depended on seasonal workload; (2) an incident in which plaintiff complained to a customer support manager that the John Day office had not received Information Systems Liaison (ISL) assistance after the office had been moved under the supervision of the Ontario office, even though ILS records demonstrated to the contrary; (3) an incident in which plaintiff complained that Krausse had been "hired over" her without interviewing or considering plaintiff for the vacant position; (4) an incident in which a representative of the Baker City Employment Office reported that plaintiff was complaining to a customer about

Krausse's poor job performance; (5) an incident in which the department received a complaint from the Training and Employment Consortium (TEC) Executive Director that plaintiff consistently complained to Batist, a TEC employee, about how the department mistreated plaintiff, thereby distracting Batist from her work and creating a negative environment; and (6) an incident in which plaintiff complained to Batist's clients and a TEC services representative that Batist was always late for appointments at the John Day office.

After reviewing the e-mails from Krausse and plaintiff's personnel file, Shutz consulted his supervisor, Henderson. Together they decided to request that plaintiff undergo an IME in order to determine whether plaintiff posed a threat of harm to herself or others and to determine whether she had a condition that prevented her from performing the essential functions of her position. Shutz also consulted with the department's risk management staff, which advised him that the department would expose itself to liability if it did not request an IME and plaintiff acted out in the workplace.

In September 2002, Shutz and Henderson drove to John Day to meet with plaintiff and explain the department's decision to request an IME. They informed plaintiff that the department was concerned about her behavior and that the purpose of requesting a medical examination was to "obtain objective medical evidence to evaluate whether there was a basis for concern about her ability to perform the essential functions of her position and/or whether she posed a threat to herself or others in the workplace." Plaintiff was told that the IME was necessary to complete the department's review of the situation, and she was given a letter that directed her to attend an IME with Dr. Holt in Boise, Idaho, on September 12, 2002. Plaintiff indicated that she would attend the examination.

Although she initially agreed to attend the IME, plaintiff several times requested that the examination be rescheduled. Eventually, plaintiff's husband indicated to Shutz that plaintiff was no longer willing to attend the IME. Shutz then scheduled a predismissal meeting, at which point plaintiff was given an opportunity to explain her refusal to attend the examination. Following the meeting, Warren, an

assistant director for the department and Henderson's supervisor, sent a letter to plaintiff informing her of the department's decision to terminate her.

Plaintiff subsequently initiated this action, asserting four claims for relief. Two claims—one for employment discrimination under ORS chapter 659A and another for intentional infliction of emotional distress—were alleged against the state. The remaining two claims (both under 42 USC section 1983) were alleged against various individual defendants. Defendants ultimately moved for summary judgment on each of plaintiff's claims, contending, as to the discrimination claim, that the state had legitimate, nondiscriminatory reasons for requesting that plaintiff submit to an IME and that plaintiff had not demonstrated a genuine issue of material fact on that point. The trial court agreed with defendants and granted their motion. Plaintiff appeals.

The crux of plaintiff's case is her contention that she was terminated for refusing to take an IME that the department had no right to request. ORS 659A.136(1) provides that an employer "may not require that an employee submit to a medical examination * * * unless the examination * * * is shown to be job-related and consistent with business necessity." Plaintiff contends that the evidence in the summary judgment record demonstrates that Shutz and Henderson, the individuals who requested that plaintiff take an IME, did not have an adequate factual basis on which to request a medical examination under ORS 659A.136(1). According to plaintiff, she therefore had the right to refuse the request and was unlawfully terminated for exercising that right. *See* ORS 659A.109 (providing that it is an unlawful employment practice to discriminate against a worker because the worker "has applied for benefits or invoked or utilized the procedures provided for in ORS 659A.100 to 659A.145").[2]

_____

[2] Although the state addresses whether plaintiff was discriminated against based on a perceived disability, plaintiff's claims appear to be based on a theory of retaliatory discharge under ORS 659A.109. In either case, her claim depends on whether the IME was authorized under ORS 659A.136, and we express no opinion as to whether ORS 659A.109 in fact encompasses claims arising out of a refusal to submit to an IME.

The threshold question before us, then, is whether the evidence in this record creates a genuine issue of material fact as to whether plaintiff had the right to refuse to submit to the IME. Said another way, the question is this: Viewing the facts in the light most favorable to plaintiff, was the request that plaintiff submit to an IME "shown to be job-related and consistent with business necessity." ORS 659A.136(1). If so, the department was entitled to request the examination, and its request cannot form the basis of a claim under ORS chapter 659A; however, if plaintiff has created a genuine issue of material fact as to whether the request for an IME was job-related or consistent with business necessity, the trial court erred in granting summary judgment.[3]

ORS chapter 659A is aimed at preventing discrimination in the workplace, including discrimination against persons with actual or perceived disabilities. ORS 659A.100 - 659A.145. In furtherance of that goal, ORS 659A.136 limits the circumstances in which employers can require employees to submit to medical examinations or make inquiries as to whether employees are disabled. ORS 659A.136(1) provides:

"Except as provided in this section, an employer may not require that an employee submit to a medical examination, may not make inquiries of an employee as to whether the employee is a person with a disability, and may not make inquiries of an employee as to the nature or severity of any disability of the employee, *unless the examination or inquiry is shown to be job-related and consistent with business necessity.*"

(Emphasis added.) The above-emphasized language is drawn from a similar provision in the federal Americans with Disabilities Act (ADA), which provides that a covered employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 USC § 12112(d)(4)(A); *see also* ORS 659A.139 (providing that

---

[3] There is no evidence in the summary judgment record that the request that plaintiff submit to an IME was a pretext for an impermissible discriminatory motive.

ORS 659A.112 to 659A.139 "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as amended").[4]

The legislative history of 42 USC section 12112(d)(4)(A) indicates that the limitations on employer-required medical examinations and disability-related inquiries were intended, among other things, to balance the employee's interest in avoiding an irrational stigma of disability with the employer's legitimate needs to know and understand the nature of an employee's medical condition:

> "An inquiry or medical examination that is not job-related serves no legitimate employer purpose, but simply serves to stigmatize the person with a disability. For example, if an employee starts to lose a significant amount of hair, the employer should not be able to require the person to be tested for cancer unless such testing is job-related. Testimony before the Committee indicated there still exists widespread irrational prejudice against persons with cancer. While the employer might argue that it does not intend to penalize the individual, the individual with cancer may object merely to being identified, independent of the consequences. As was made abundantly clear before the Committee, being identified as disabled often carries both blatant and subtle stigma. An employer's legitimate needs will be met by allowing those medical inquiries and examinations which are job-related and consistent with business necessity."

HR Rep No 485(II), 101st Cong, 2nd Sess, *reprinted in* 1990 USCCAN 303, 357-58. In light of those competing concerns, federal courts that have applied 42 USC section 12112(d)(4)(A) have permitted employers to determine the cause of an employee's aberrant behavior without running

---

[4] The "job-related" and "consistent with business necessity" language also appears in 42 USC section 12112(b)(6), which provides that an employer unlawfully discriminates by

"using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, *is shown to be job-related for the position in question and is consistent with business necessity*[.]"

(Emphasis added.)

afoul of the ADA. In *Sullivan v. River Valley School Dist.*, 197 F3d 804, 810 (6th Cir 1999), *cert den*, 530 US 1262 (2000), for example, the Sixth Circuit affirmed a grant of summary judgment to an employer who required its employee, a teacher who had engaged in hostile and confrontational outbursts, to submit to mental and physical examinations to determine his fitness to continue teaching. The court explained:

> "Given that an employer needs to be able to determine the cause of an employee's aberrant behavior, [the fact that examinations were required] is not enough to suggest that the employee is regarded as mentally disabled * * *. [An] employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled."

*Id.* The court described its inquiry in this way:

> "[F]or an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job. An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can 'perform job-related functions.' 42 USC § 12112(d)(4)(B)."

*Id.* at 811.

Similarly, in *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F3d 595 (8th Cir 1998), an employee brought a claim under the ADA based, in part, on her employer's decision to require that she submit to a psychiatric evaluation before returning to work after being on medical leave for depression. The Eighth Circuit affirmed the district court's grant of summary judgment to the employer:

> "An employer's request for a mental evaluation is not inappropriate if it is not obvious that an employee suffers from a disability. A request for an evaluation is not equivalent to treatment of the employee as though she were substantially impaired. * * * Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims under §§ 12112(a) and 12102(2)(C)."

*Cody*, 139 F3d at 599.

We have no reason to believe that the Oregon legislature, in enacting the Oregon counterpart to 42 USC section 12112(d)(4)(A), intended anything different from what Congress intended with regard to the balance between employer and employee interests. In light of that intent, we echo the reasoning of those courts that have observed that employers must be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to liability for disability discrimination.

With those principles in mind, we turn to the facts in this case. As described above, it is undisputed that the department had received the following information regarding plaintiff, much of which was relayed through Krausse, plaintiff's coworker at the John Day office:

- Plaintiff was seen standing in the bathroom in a "trance-like" state, pulling out paper towels one after another. The incident reportedly made the observer, Krausse's sister, so uncomfortable that she felt compelled to leave the facility.

- Plaintiff was seen standing with her back up against the bathroom stall in a despondent state.

- Krausse reported seeing plaintiff "totally lose emotional control" with her supervisor, to the point where Krausse "was not sure what she might do to her."

- Plaintiff reportedly accused Krausse of stealing trash and pasting it together.

- Krausse reported that plaintiff "spends most of her day e-mailing, printing the e-mails, reading them, tearing them up and now she is keeping them in a giant manila envelope since she suspects that I retrieve them from the trash." Another individual reportedly "personally witnessed [plaintiff] take a disinfectant wipe and wipe the manila envelope as though cleaning it."

- The department had received escalating complaints regarding plaintiff's job performance, which culminated in plaintiff's two-week suspension.

In response to the reports regarding those incidents, the department determined that it was appropriate to ask plaintiff to submit to an IME to determine whether a medical condition interfered with her ability to perform the essential functions of her job or caused her to be a danger to herself or others.

The department's request that plaintiff submit to a medical examination under those circumstances was, as a matter of law, both "job-related" and "consistent with business necessity." As to the first requirement, plaintiff cannot reasonably dispute that the request was "job-related"; it flowed directly from complaints that human resources had received regarding plaintiff's interactions with coworkers and clients and their concerns that she posed a safety risk at work.

Nor is there any genuine issue of material fact as to whether the request was "consistent with business necessity." The record demonstrates that plaintiff, over a two-year period, was the subject of escalating complaints regarding job performance, including disciplinary action. At the same time, Shutz and Henderson had received complaints about strange behavior from plaintiff, some of which had made plaintiff's coworker fear for her own safety. It is undisputed that, after consulting risk management, they concluded that, to protect the department's employees and clients, to insulate the department from liability,[5] and to determine whether plaintiff could continue to perform the essential functions of her position, it was necessary to request that plaintiff submit to an independent medical examination. At the very least, the undisputed evidence supported Shutz's and Henderson's concerns as to whether plaintiff had a medical condition that was interfering with her performance of the essential functions of her position.[6] Thus, on the record before us, no reasonable

---

[5] Under ORS 654.010, employers have an obligation to their employees to "furnish employment and a place of employment which are safe and healthful for employees" and to "adopt and use such practices, means, methods, operations and processes as are reasonably necessary to render such employment and place of employment safe and healthful, and shall do every other thing reasonably necessary to protect the life, safety and health of such employees."

[6] Plaintiff attempts to create a genuine issue of material fact by relying on a statement in Shutz's affidavit that he did not have a "preconceived notion that

juror could conclude that the department's request was anything other than "consistent with business necessity."

Because plaintiff failed to create a genuine issue of material fact as to whether the department's request that she submit to a medical examination was "job related" and "consistent with business necessity," the trial court correctly granted summary judgment on plaintiff's ORS chapter 659A claim. Accordingly, we reject her first assignment of error.

Plaintiff also assigns error to the trial court's rulings regarding her IIED claim and her section 1983 claims. A discussion of those assignments of error would not benefit the bench, the bar, or the public, and we reject them without discussion.

Affirmed.

---

[plaintiff] had a condition that impaired or limited her ability to perform the essential functions of the job, the Department was just concerned with trying to investigate Krausse's concerns regarding workplace safety." In context, however, it is clear that Shutz was addressing whether he had a preconceived notion about whether plaintiff was *disabled*; the statement cannot be read as an acknowledgment that plaintiff was adequately performing the essential functions of her job, or even as a statement that he had no questions in that regard. In the same affidavit, Shutz explicitly stated that plaintiff's personnel file "gave rise to legitimate questions of whether plaintiff could perform her job."