Argued and submitted June 12, affirmed September 2, 2015, petition for review
denied February 4, 2016 (358 Or 551)

Michael VAN PATTEN,
Mark Banks, Carl Ralls,
William McGill and Dan Russ,
*Plaintiffs-Appellants,*

*v.*

STATE OF OREGON
and Kelly Ballas,
*Defendants-Respondents,*
*and*

OREGON HEALTH DEPARTMENT,
Department of Corrections,
Oregon State Police and Bruce Goldberg,
*Defendants.*

Marion County Circuit Court
13C13249; A155862

359 P3d 469

Richard Myers argued the cause for appellants. On the
briefs were Thomas K. Doyle and Bennett, Hartman, Morris
& Kaplan, LLP.

Matthew J. Merritt, Assistant Attorney General, argued the cause for respondents. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before DeVore, Presiding Judge, and Garrett, Judge, and Schuman, Senior Judge.

SCHUMAN, S. J.

## SCHUMAN, S. J.

Plaintiffs are state employees who hold state-subsidized health insurance policies administered by the Public Employees' Benefit Board (PEBB). They brought this action against the state and the then-PEBB administrator, Kapowich,[1] contending that one aspect of the insurance program, a self assessment questionnaire, requires them to disclose disabilities, and, in so doing, violates a provision of the Americans with Disabilities Act, 42 USC § 12112(d)(4)(A) (2009) (ADA), and its Oregon analog, ORS 659A.136. They also contend that the assessment amounts to an unconstitutional search and a violation of their constitutional right to the privacy of personal information. Defendants moved for summary judgment on the ground that the assessment does not contain "disability inquiries"; that, even if it does contain such inquiries, they fall within statutory "safe harbor" provisions that permit certain inquiries used by insurance providers; and that the assessment was neither a search nor an unlawful invasion of any constitutionally protected privacy interest. The trial court agreed with defendants' arguments and granted their motion for summary judgment. Plaintiffs appeal. We affirm.

Because there are no disputed issues of fact—plaintiffs protestations to the contrary notwithstanding, as we explain below—we review the trial court's grant of summary judgment to determine whether defendants are entitled to a judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). The legal questions revolve around one part of PEBB's insurance program, a "Health Engagement Model" that urges state employees who want to obtain (or maintain) state-subsidized health insurance to fill out an on-line "health risk assessment" questionnaire provided by one of two health plan providers, Kaiser Permanente or Providence

---

[1] Plaintiffs originally named the following defendants in addition to the state and Kapowich: Oregon Health Department, Oregon Department of Corrections, Oregon State Police, and Bruce Goldberg. The trial court granted defendants' motion to dismiss these additional defendants and plaintiffs do not assign error to that decision. Since this action commenced, Kapowich is no longer the PEBB administrator.

Health & Services.[2] The questionnaires both contain questions that are highly personal and could indicate the presence of a disability—for example, whether the employee has cancer, hepatitis B, a sexually transmitted infection, depression, or a host of other conditions. Employees are informed, however, that they do not need to answer all of the questions, although they are urged to do so.[3]

The assessment is filled out privately, on line, and then automatically forwarded to one of two private, for-profit administrators (treated as state agents for purposes of the ADA), who aggregate the responses, securely store the individual questionnaires until they are destroyed, and forward the aggregated data to PEBB. PEBB and state employers receive only a list of employees who have taken the assessment and a summary of the aggregated, "anonymized" or "de-identified" data. Importantly, neither PEBB nor any state employer receives the results of an individual's assessment, and the employee's health care provider receives the information only if the employee affirmatively so authorizes.

---

[2] There have been two Health Engagement Model programs. The first was implemented in 2011 and was in effect during 2012, and the second was implemented in 2013 and is still in effect. The two programs are similar. One significant difference is that, under the original program, a nonparticipating employee paid a higher premium than participants, while under the 2013 program, the nonparticipating employee had, in addition to increased premiums, a larger deductible than participants. Plaintiffs filed this case, seeking declaratory and injunctive relief in addition to damages, before the 2013 plan was in effect. In a motion to dismiss, the state argued that the case was moot because the only program that plaintiffs challenged had ceased to exist. The court ruled that the declaratory and injunctive claims were moot but that the damages claim was not. The court also informed plaintiffs that, if they wanted to expand the scope of their complaint by adding claims regarding the 2013 program, they could file an amended complaint. They never did so. Thus, the only claim before this court is plaintiffs' claim for damages resulting from the 2012 program; the only operative complaint does not allege anything about the 2013 program, and plaintiffs do not assign error to the trial court's ruling that the injunctive and declaratory claims with respect to the 2012 program are moot. However, in their motion practice and on appeal, the parties appear to presume that both programs are implicated. Because our disposition of the appeal is based on features common to both programs, the failure to include claims involving the 2013 program has no practical consequences.

[3] The Kaiser questionnaire is considered "completed" if the employee answers questions disclosing his or her gender, age, amount of physical activity, and tobacco use. The Providence questionnaire is considered "completed" if the employee answers questions regarding his or her gender, age, and waist circumference (or height/weight ratio).

Kaiser, Providence, and the two private administrators are all subject to the elaborate client security measures required by the federal Health Insurance Portability and Accountability Act (HIPAA). PEBB uses the aggregated results to help in the design of future health plan offerings.

It also uses the program itself as a way to encourage employees to adopt beneficial health habits, thereby, presumably, reducing insurance costs. It does so by requiring each assessment taker to agree to undertake two "health actions." The agreement is not policed. Assessment takers are simply asked to report whether they took the health actions. They are not required to submit proof or to identify which actions they took. As PEBB states on its webpage explaining the health action aspect of the HEM, "You choose your own health actions, you track them any way you want, and there's no reporting involved."

Although an employee's eligibility for state sponsored health insurance does not depend on whether the employee has completed the assessment, those who do not complete it pay more for their insurance than those who do.[4] The difference is currently $17.50 per month for individuals or $35.00 per month for couples. Nonparticipants also currently have a deductible that is $100.00 larger than participants. The parties agree that, because of this financial disincentive, participation in the assessment is not "voluntary" as that term is defined in the ADA.[5] They also agree that defendants' use of private third-party administrators to convert individual responses into aggregated data does not insulate the state and PEBB from ultimate legal responsibility for the program.

---

[4] Note the definition of "completed," above, 273 Or App at 479 n 3.

[5] Because the state concedes that the program is not voluntary, we do not examine the significance, if any, of the fact that no state employee is required to enroll in PEBB's state-sponsored health insurance plan, nor is there any evidence in the record that alternative plans are necessarily less expensive or otherwise less advantageous than PEBB's. We further note that, at present, the EEOC has proposed (but not yet promulgated) a rule amendment that "clarifies that the offer of limited incentives to participate in wellness programs that are part of a group health plan and that include disability-related inquiries and/or medical examinations, will not render the program involuntary." "Amendments to Regulations Under the Americans With Disabilities Act." (80 Fed Reg 21659 (April 20, 2015) (Proposed Rule)).

Plaintiffs insist that two—and only two—of these facts are disputed in the record on summary judgment. First, they argue that a fact issue remains as to whether PEBB uses the aggregated data to design future health plan offerings. We disagree. Kapowich, PEBB's administrator, stated in a sworn declaration that the "aggregated data enables PEBB to understand the overall health trends of the population it [i]nsures. PEBB uses this information along with other health survey and utilization data to help in designing health plan offerings for employees in future years." That statement stands uncontradicted by anything in the record.

Second, plaintiffs argue that there is a disputed issue of fact as to whether an employee's responses to the assessment are revealed to defendants. In their brief, plaintiffs suggest a hypothetical scenario in which, through a series of unlikely events, an unscrupulous supervisor might discern that a particular employee has a particular disability by matching the supervisor's updated lists showing which employees have taken the assessment, with an updated report of aggregated data. This hypothetical scenario is far-fetched; more importantly, Kapowich stated on the record that the individual assessments *are* private, *are* secure, and that they are "de-identified" before defendants—or any other state employee—ever sees them. Again, plaintiffs presented no facts to the trial court that dispute those assertions. Even on appeal, they present only speculation about what they suppose could, hypothetically, happen. Such hypothetical musings do not create a disputed issue of *fact*.

We therefore turn to an analysis of plaintiffs' primary legal argument that requiring employees to take the HEM risk assessment questionnaire violates 42 USC § 12112(d)(4)(A), which provides:

"A covered entity shall not *** make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."

The parties agree that PEBB is a "covered entity," that (as noted) completing the assessment could reveal the existence

or severity of a disability, and that the assessment is not job-related or justified by business necessity. Thus, the question before us reduces to whether, in the assessment, defendants "make *inquiries*" regarding disabilities, despite the fact that neither PEBB nor any state employer ever sees or learns of any individual's responses. Plaintiffs rely on what they assert is the plain meaning of the term "inquiries," as well as the "Enforcement Guidance" from the Equal Employment Opportunity Commission (EEOC), the federal agency charged with enforcing the ADA: A "disability inquiry" is "a question (or a series of questions) that is likely to elicit information about a disability." *Enforcement Guidance: Disability-related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act* (2000).[6] Defendants respond that the "plain meaning" is not so plain, particularly in light of the context in which the "inquiries" are made and the responses "elicited."

Neither the parties nor we have found precedent from any jurisdiction, or any other source, examining the precise question at issue here.[7] We therefore confront a question of first impression requiring us to interpret an Act of Congress. In doing so, "we follow the methodology prescribed by federal courts." *Hagan v. Gemstate Manufacturing, Inc.*, 328 Or 535, 545, 982 P2d 1108 (1999). As the Supreme Court recently explained,

> "If the statutory language is plain, we must enforce it according to its terms. *Hardt v. Reliance Standard Life Ins. Co.*, 560 US 242, 251[, 130 S Ct 2149, 176 L Ed 2d 998] (2010). But oftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.' [*FDA v.*] *Brown & Williamson*, 529 US [120, 132, 120 S Ct 1291, 146 L Ed 2d 121 (2000)]. So when deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the

---

[6] Available at http://www.eeoc.gov/policy/docs/guidance-inquiries.html (Question 1). EEOC interpretations of the ADA are not controlling, but they are "entitled to respect" to the extent that they are persuasive. *Christensen v. Harris Cty.*, 529 US 576, 587, 120 S Ct 1655, 146 L Ed 2d 621 (2000).

[7] As discussed below, one case, *Seff v. Broward Cnty.*, 778 F Supp 2d 1370, 1374 (SD Fla 2011) *aff'd sub nom Seff v. Broward Cnty., Fla.*, 691 F3d 1221 (11th Cir 2012), deals with a wellness program that is similar to PEBB's, but that case does not address the meaning of "inquiry."

overall statutory scheme.' *Id.* at 133. \*\*\* Our duty, after all, is 'to construe statutes, not isolated provisions.' *Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson,* 559 US 280, 290[, 130 S Ct 1396, 176 L Ed 2d 225] (2010) (internal quotation marks omitted)."

*King v. Burwell,* ___ US ___, ___, 135 S Ct 2480, 2489, 192 L Ed 2d 483 (2015) (first and fourth brackets added; others in original).

It is undeniable that the assessment asks employees to answer questions. In context, however, that fact does not necessarily compel the conclusion that the questions are "inquiries." The dictionary reports that the primary definition of "inquiry" is "the act or an instance of seeking truth, information, or knowledge about something." *Webster's Third New Int'l Dictionary* 1167 (unabridged ed 1993). If the person or entity asking a question knows that it will not receive a response to that question, then it makes no sense to regard the questioner as "seeking" truth, information, or knowledge about anything. By analogy, a person requesting that a friend donate money to a charity cannot be said to be "seeking" that money, because the person has no expectation of receiving it. That, at least, is one plausible meaning of the term. That being the case, we conclude that the term "inquiries" in the unique circumstances of an anonymous health assessment questionnaire is, at the least, ambiguous.

We must therefore proceed to interpret the term "with a view to [its] place in the overall statutory scheme." *King,* ___ US at ___, 135 S Ct at 2489 (internal quotation marks omitted). The parties agree, as they must, that the "overall statutory scheme" of the ADA, its acknowledged purpose, is to prevent employers from discriminating against persons who have, or are perceived to have, disabilities. As the legislative history confirms,

"The purpose of the ADA is to provide a clear and comprehensive national mandate to end discrimination against individuals with disabilities and to bring persons with disabilities into the economic and social mainstream of American life; to provide enforceable standards addressing discrimination against individuals with disabilities, and to ensure that the Federal government plays a central role

in enforcing these standards on behalf of individuals with disabilities."

H.R. REP. NO. 101-485, at 22-23 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 304. Plaintiffs' interpretation of 42 USC § 12112(d)(4)(A) does nothing to advance the purpose of the ADA. It seems, rather, to be an attempt by plaintiffs to isolate a particular provision of the ADA and conscript it to their own uses instead of the uses which motivated Congress to enact it. Indeed, the ADA governs relationships between employers and employees, and plaintiffs' interpretation, banning the flow of information between employees and third parties who are not employers, introduces a foreign and extraneous concept. For these reasons, we conclude that the questions in PEBB's risk assessment questionnaire are not prohibited disability inquiries.

That conclusion obviates the need to address defendants' alternative argument that, if the assessment poses disability inquiries, they fall within the ADA's so-called "insurance safe harbor" provision, 42 USC § 12201(c), which provides that certain provisions of the ADA, including 42 USC § 12112(a)(4)(A),

"shall not be construed to prohibit or restrict—

"\* \* \* \* \*

"(2)   a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law[.]"

We note in passing, however, that we find persuasive the reasoning in the only case addressing the insurance safe harbor in the context of a wellness program identical to PEBB's in all relevant respects. The court reasons:

"The wellness program falls under the safe harbor provision because it is designed to develop and administer present and future benefits plans using accepted principles of risk assessment. The program renders aggregate data to the [defendant] County that it may analyze when developing future benefit plans. The County uses this information to classify various risks and decide what type of benefits

plans will be needed in the future in light of these risks. The County is thus determining what kind of coverage will need to be provided. Though it is not underwriting or classifying risks on an individual basis, it is underwriting and classifying risks on a macroscopic level so it may form economically sound benefits plans for the future. Furthermore, the wellness program is an initiative designed to mitigate risks. It is based on the theory that encouraging employees to get involved in their own healthcare leads to a more healthy population that costs less to insure. In other words, the program is based on underwriting, classifying, and administering risks because its ultimate goal is to sponsor insurance plans that maintain or lower its participant's premiums."

*Seff v. Broward Cnty.*, 778 F Supp 2d 1370, 1374 (SD Fla 2011), *aff'd sub nom Seff v. Broward Cnty., Fla.*, 691 F3d 1221 (11th Cir 2012).

Plaintiffs next argue that the risk assessment questionnaire violates ORS 659A.136:

"(1)   Except as provided in this section, an employer may not require that an employee submit to a medical examination, may not make inquiries of an employee as to whether the employee has a disability, and may not make inquiries of an employee as to the nature or severity of any disability of the employee, unless the examination or inquiry is shown to be job-related and consistent with business necessity.

"(2)   An employer may conduct voluntary medical examinations, including voluntary medical histories that are part of an employee health program available to employees at that work site. An employer can make inquiries into the ability of an employee to perform job related functions."

Plaintiffs acknowledge that this provision "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990." ORS 659A.139(1); *Heiple v. Henderson*, 229 Or App 693, 703, 215 P3d 891 (2009). However, they argue that the clause introducing the statute—"Except as provided in this section"—has the effect of rendering Oregon's disability inquiry statute fundamentally different from the federal ADA so that the two cannot be read consistently with each other. Plaintiffs' reasoning,

as we can best understand it, is as follows: (1) The Oregon statute, by stating that an employer may not make a disability inquiry "except as provided in this *section*," means that the only exceptions to the prohibition of disability inquiries are the ones in ORS 659A.136 (emphasis added). (2) Those exceptions include inquiries that are job-related and consistent with business necessity, and inquiries that are part of a voluntary program. (3) PEBB's inquiries are not job related or consistent with business necessity, nor is the assessment part of a voluntary program. (4) Therefore, PEBB's program violates ORS 659A.136(1). There are several obvious flaws with that argument. For example, the fact that ORS 659A.136(2) allows employers to take employees' voluntary medical histories does not logically imply that employers cannot take employees' involuntary medical histories. However, the most obvious shortcoming of plaintiffs' argument is that it fails to address the question of whether the assessment makes disability inquiries in the first place—which is the exact question at which plaintiffs' argument is aimed. In sum, we conclude that PEBB's risk assessment questionnaire does not violate the ADA or Oregon's analog to that federal statute.

We reach a similar conclusion with respect to plaintiffs' Fourth Amendment claim. Plaintiffs contend that, by requiring them to reveal medical information regarding which they have a reasonable expectation of privacy, defendants are conducting a prohibited warrantless search. It is true that the Fourth Amendment protects reasonable expectations of privacy and that the protection is not limited to invasions of physical space. *Katz v. United States*, 389 US 347, 353, 88 S Ct 507, 19 L Ed 2d 576 (1967). Those precepts do not establish that the Fourth Amendment protection extends to intrusive questioning about assertedly private matters. The cases that plaintiffs rely on establish no such thing. *O'Connor v. Ortega*, 480 US 709, 107 S Ct 1492, 94 L Ed 2d 714 (1987), deals with a physical search of a government employee's work space. In *Yin v. State of Cal.*, 95 F3d 864, 870-73 (9th Cir 1996), the court dealt with a *medical exam* (and held that compelling an employee to submit to it did *not* violate the Fourth Amendment). *Vernonia Sch. Dist. 47J v. Acton*, 515 US 646, 115 S Ct 2386, 132 L Ed 2d

564 (1995), and *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 US 822, 122 S Ct 2559, 153 L Ed 2d 735 (2002), dealt not with questioning but with urine testing. The only cases that address the issue of a Fourth Amendment right not to be subjected to intrusive questioning appear to refute plaintiffs' position, not to support it. *See National Aeronautics and Space Administration v. Nelson*, 562 US 134, 162, 131 S Ct 746, 178 L Ed 2d 667 (2011) (Scalia, J. concurring) ("[T]he Fourth Amendment does not prohibit the Government from asking questions about private information."); *Greenawalt v. Ind. Dep't of Corr.*, 397 F3d 587, 591 (7th Cir 2005) (a psychological examination required for continued government employment was not a search under the Fourth Amendment).[8] In short, at least for now, there is no such thing as a Fourth Amendment right to be free from intrusive questioning, and plaintiffs provide no reason why this court should be the first to find one.

Plaintiffs also argue that the assessment violates their Due Process right to the privacy of their personal medical information.[9] The first thing to be said about this claim

---

[8] We find the Seventh Circuit analysis persuasive:

"The implications of extending the [application of the Fourth Amendment to cases] involving mere questioning would be strange. In a case involving sex or some other private matter, a government trial lawyer might be required to obtain a search warrant before being allowed to conduct a cross-examination—or the judge before being allowed to ask a question of the witness. Police might have to obtain search warrants or waivers before conducting routine inquiries, even of the complaining witness in a rape case, since they would be inquiring about the witness's sexual behavior. Questioning in a police inquiry or a background investigation or even a credit check would be in peril of being deemed a search of the person about whom the questions were asked. Psychological tests, widely used in a variety of sensitive employments, would be deemed forbidden by the Constitution if a judge thought them 'unreasonable.' *** The Fourth Amendment was not drafted, and has not been interpreted, with interrogations in mind. We are not surprised to have found no appellate case that supports the plaintiff's position."

397 F3d at 590-91 (Posner, J.).

[9] The parties debate this issue as though it involves the scope of the Fifth Amendment. That is incorrect. The Fifth Amendment limits only the federal government. To the extent that this case implicates a constitutional right to privacy, that right derives from the Due Process Clause of the Fourteenth Amendment, which applies directly (that is, not by incorporation) against states. *See, e.g., Nixon v. Adm'r of Gen. Servs.*, 433 US 425, 97 S Ct 2777, 53 L Ed 2d 867 (1977) (challenge to federal statute under Due Process Clause of the Fifth Amendment); *Whalen*, 429 US 589 (challenge to state law under Due Process Clause of the Fourteenth Amendment).

is that the Supreme Court has never held that such a right exists. Two of the Court's cases from 1977 seem to suggest, without holding, that it does. In *Whalen v. Roe*, 429 US 589, 591, 97 S Ct 869, 51 L Ed 2d 64 (1977), the question before the Court was "whether the State of New York may record, in a centralized computer file, the names and addresses of all persons who have obtained, pursuant to a doctor's prescription, certain drugs for which there is both a lawful and an unlawful market." The Court observed that "privacy" implicates two "interests." One is the individual interest in avoiding disclosure of personal matters—what has come to be called "informational privacy"—and the other is the interest in making certain kinds of important, identity-forming decisions, such as whether to carry a pregnancy to term. *Id.* at 599-600. Without expressly holding that the former interest derives from the constitution, the Court ultimately held that the New York program did not "on its face, pose a sufficiently grievous threat to either interest to establish a constitutional violation." *Id.* at 600.

Later in the same term, in *Nixon v. Adm'r of Gen. Servs.*, 433 US 425, 97 S Ct 2777, 53 L Ed 2d 867 (1977), the Court rejected the ex-President's challenge to a statute that provided access to some of his papers and tape recordings. Nixon asserted a constitutional right to protection against this asserted invasion of his personal privacy. Once again, the Court appeared to imply that, in some exceptional circumstances, such a right might exist, but refrained from actually holding that it did. Instead, the Court, citing *Whalen*, noted that,

"[o]ne element of privacy has been characterized as 'the individual interest in avoiding disclosure of personal matters * * *.' *Whalen*[, 429 US at 599]. We *may* agree with appellant that, at least when Government intervention is at stake, public officials, including the President, are not wholly without constitutionally protected privacy rights in matters of personal life unrelated to any acts done by them in their public capacity."

*Nixon*, 433 US at 457 (ellipses and emphasis added). The Court then held that, even if such a constitutional right existed, it had to be "considered in light of the specific provisions of the [challenged] Act and any intrusions must be

weighed against the public interest[.]" *Id.* at 458. Applying that balancing test, the Court concluded that Nixon's claim was without merit. *Id.* at 465.

Understandably, lower courts in the wake of these cases struggled to discern whether the Court had recognized a person's Due Process right to the privacy of his or her personal information. Some courts held that *Whalen* and *Nixon* recognize such a right, although these courts all caution that the right is not absolute, but rather, subject to a balancing of the individual's interest in maintaining the privacy of the information with the government's interest in obtaining it.[10] Other courts have held that the purported right simply does not exist.[11] Still others have stated that, as best they could determine, neither *Whalen* nor *Nixon* resolved the issue one way or the other.[12]

The Supreme Court took up the question again in *Nelson*, 562 US at 138. The Court wasted no time in announcing that it was not going to resolve the underlying constitutional issue; rather, it would *presume* that a constitutional right to informational privacy existed and employ a balancing test to determine whether government action violated that right under the particular circumstances of the case. The opinion's first sentences declared:

> "In two cases decided more than 30 years ago, this Court referred broadly to a constitutional privacy 'interest in avoiding disclosure of personal matters.' [*Whalen*, 429 US at 599-600; *Nixon*, 433 US at 457]. Respondents in this case, federal contract employees at a Government

---

[10] *See, e.g., Tucson Woman's Clinic v. Eden*, 379 F3d 531, 551 (9th Cir 2004) ("Individuals have a constitutionally protected interest in avoiding 'disclosure of personal matters' including medical information." (Quoting *Whalen*, 429 US at 599.)); *Wolfe v. Schaefer*, 619 F3d 782, 785 (7th Cir 2010) ("The courts of appeals, including this court, have interpreted *Whalen* to recognize a constitutional right to the privacy of medical * * * information.").

[11] *See, e.g., J. P. v. De Santi*, 653 F2d 1080, 1088-89 (6th Cir 1981) ("We do not view the discussion of confidentiality in *Whalen v. Roe* as * * * creating a constitutional right to have all government action weighed against the resulting breach of confidentiality. * * * The Court explicitly refused to address the existence of such a right."); *accord Doe v. Wigginton*, 21 F3d 733, 740 (6th Cir 1994).

[12] *See, e.g., Borucki v. Ryan*, 827 F2d 836, 848 (1st Cir 1987) ("As of June 1983, * * * there was a split in the circuits as to whether the right of privacy includes a general right of nondisclosure applicable to personal records."); *Anderson v. Romero*, 72 F3d 518, 522 (7th Cir 1995).

> laboratory, claim that two parts of a standard employment background investigation violate their rights under *Whalen* and *Nixon*. Respondents challenge a section of a form questionnaire that asks employees about treatment or counseling for recent illegal-drug use. They also object to certain open-ended questions on a form sent to employees' designated references. We assume, without deciding, that the Constitution protects a privacy right of the sort mentioned in *Whalen* and *Nixon*. We hold, however, that the challenged portions of the Government's background check do not violate this right in the present case. The Government's interests as employer and proprietor in managing its internal operations, combined with the protections against public dissemination provided by the Privacy Act of 1974, satisfy any 'interest in avoiding disclosure' that may 'arguably ha[ve] its roots in the Constitution.' *Whalen*."

*Nelson*, 562 US at 138 (brackets in original; citations omitted). Thus, although *Nelson* does not resolve the constitutional question, it nonetheless provides some useful guidance in cases such as this one. First, *Nelson* counsels against attempting to resolve the constitutional question if doing so can be avoided. Second, it instructs that the resolution depends on balancing the government's interest in seeking the personal information against the individual's interest—constitutional or otherwise—in nondisclosure. Third, it counsels that the balance is even-handed; that is, *Nelson* expressly rejects the arguments that government's interest in seeking personal information needs to be compelling, and that government must use the least intrusive means to achieve its objective. *Id.* at 153. Fourth, *Nelson* emphasizes the importance of the context in which the government inquiries occur, thereby establishing that the factors that figure into any particular case, including *Nelson* itself, are not necessarily relevant to other cases, nor are they exclusive. *Id.* at 148 ("As an initial matter, judicial review of the Government's challenged inquiries must take into account the context in which they arise."). Fifth, it points out that inquiries by government of its own employees are subjected to a lower level of scrutiny than inquiries of the general population. *Id.*

It remains for us to apply these precepts to the case before us. In doing so, we also recognize, to the extent that

they are relevant and helpful, the considerations that a number of federal circuit courts have identified:

> "The factors which should be considered in deciding whether an intrusion into an individual's privacy is justified are the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, * * * the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access."

*United States v. Westinghouse Elec. Corp.*, 638 F2d 570, 578 (3d Cir 1980); *accord Tucson Women's Clinic*, 379 F3d at 551; *Planned Parenthood of S. Arizona v. Lawall*, 307 F3d 783, 790 (9th Cir 2002); *Doe v. Attorney Gen. of United States*, 941 F2d 780, 796 (9th Cir 1991).

We begin with the government's interests in obtaining the data on HEM self-assessment questionnaires. There are two: to improve the health of state employees and to help PEBB design more efficient future health plan offerings. Perhaps these interests are not as compelling as, for example, the state's interest in obtaining information regarding prescriptions for narcotics in *Whalen*, 429 US at 604, the public's interest in preserving access to Presidential papers in *Nixon*, 433 US 458, or the government's interest in "ensuring the security of its facilities and in employing a competent, reliable work force" at issue in *Nelson*, 562 US at 150. However, maintaining the health of its work force, lowering health insurance costs, and planning effective and efficient future health plans are all important interests, *see Tucson Woman's Clinic*, 379 F3d at 553 (promoting health is a "strong" governmental interest) and, as noted above, the state does not need to assert a compelling interest. *Nelson*, 562 US at 153. Further, as the Court emphasized in *Nelson*, "[t]ime and again our cases have recognized that the Government has a much freer hand" when dealing with its own employees than it does in dealing with citizens at large. 562 US at 148.

An employee who answers all of the questions on the survey will reveal highly sensitive personal information.

In that sense, the survey's intrusion on his or her interest in informational privacy is great. However, that intrusion is mitigated by the context in which the intrusion occurs. The information in its individually identifiable form is seen only by the employees at the companies that convert the individual responses into aggregated data[13] and, if the employee so chooses, the employee's health care provider. The conversion companies, the insurers, and the healthcare providers are all subject to the stringent security protections required by HIPAA. Wrongful disclosure of individually identifiable health information by a person in a HIPAA covered entity is a crime, punishable by a fine of up to $50,000, a prison term of up to one year, or both. 42 USC § 1320d-6(a), (b)(1).[14] These facts regarding the security of data are significant; in denying plaintiffs' privacy claims in *Whalen, Nixon,* and *Nelson,* the Supreme Court afforded great weight to the fact that the governmental defendants were governed by strict disclosure prohibitions. In *Whalen,* the Court observed, "Public disclosure of the identity of patients is expressly prohibited by the statute and by a Department of Health regulation. Willful violation of these prohibitions is a crime punishable by up to one year in prison and a $2,000 fine." 429 US at 594-95. The Court in *Nixon* emphasized that the statute providing increased access to official Presidential records also contained "regulations * * * aimed at preventing undue dissemination of private materials." 433 US at 458. These measures are summarized and expanded in *Nelson,* where the Court emphasized that the provisions calling for background checks of employees were

> "subject to substantial protections against disclosure to the public. Both *Whalen* and *Nixon* recognized that government 'accumulation' of 'personal information' for 'public purposes' may pose a threat to privacy. But both decisions also stated that a 'statutory or regulatory duty to avoid unwarranted disclosures' generally allays these privacy concerns. The Court in *Whalen,* relying on New York's

---

[13] In fact, the individually identifiable data may not even be seen by humans in the conversion process; the record does not disclose whether the process is performed by people or computers.

[14] Potential penalties range upward to not more than $250,000, up to 10 years in prison, or both, if the information is released under false pretenses or for commercial purposes. 42 USC § 1320d-6(b)(2), (3).

'security provisions' prohibiting public disclosure, turned aside a challenge to the collection of patients' prescription information. In *Nixon*, the Court rejected what it regarded as an even 'weaker' claim by the former President because the Presidential Recordings and Materials Preservation Act '[n]ot only * * * mandate[d] regulations' against 'undue dissemination,' but also required immediate return of any 'purely private' materials flagged by the Government's archivists. * * * And here, no less than in *Whalen* and *Nixon*, the information collected is shielded by from 'unwarranted disclosur[e].' The Privacy Act, which covers all information collected during the background-check process, allows the Government to maintain records 'about an individual' only to the extent the records are 'relevant and necessary to accomplish' a purpose authorized by law. The Act requires written consent before the Government may disclose records pertaining to any individual. And the Act imposes criminal liability for willful violations of its nondisclosure obligations. These requirements, as we have noted, give 'forceful recognition' to a Government employee's interest in maintaining the 'confidentiality of sensitive information * * * in his personnel files.' Like the protections against disclosure in *Whalen* and *Nixon*, they 'evidence a proper concern' for individual privacy."

562 US at 155-56 (case citations omitted; brackets in original; second and third ellipses in original).

Nothing in the record would support an inference that the HIPAA security provisions will not be observed. *Cf. Whalen*, 429 US at 601 ("There is no support in the record * * * for an assumption that the security provisions of the statute will be administered improperly."). That being the case, the intrusion into plaintiffs' constitutional right to informational privacy, if there is such a thing, is negligible. The individual employee who chooses to answer intrusive questions knows that no person or entity with any acquaintance with, or power over, the employee ever sees that information, because during the brief time that the information is individually identifiable, it is not in the possession of any state employer and it is protected by stringent security measures.

In *Nelson*, the Supreme Court held that the government's interest as an employer in managing its internal

affairs, combined with protections against public dissemination, outweighed the plaintiff's interest in nondisclosure. 562 US at 138. We reach the same conclusion here.

In sum, defendants' health assessment questionnaire violates neither the federal ADA, its state analog, or the Fourth or Fourteenth Amendments.

Affirmed.